[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 21-10387

_____

STACEY IAN HUMPHREYS,

Petitioner-Appellant,

*versus*

WARDEN, GEORGIA DIAGNOSTIC PRISON,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:18-cv-02534-LMM

_____

Before WILLIAM PRYOR, Chief Judge, and ROSENBAUM and NEWSOM, Circuit Judges.

PER CURIAM:

Petitioner Stacey Humphreys, a death-row inmate in Georgia, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Between the district court and this Court, Humphreys received a certificate of appealability ("COA") on four issues. First, Humphreys asserts that juror misconduct and bias plagued the proceedings and deprived him of his due-process rights. Second, Humphreys contends the trial court gave an improper *Allen* charge, which compounded the juror misconduct. And third and fourth, Humphreys asks us to find that his trial counsel was ineffective during the investigation and presentation of mitigating evidence and that his appellate counsel was ineffective for failing to raise the juror-misconduct claim sooner.

After careful consideration of the claims and with the benefit of oral argument, we affirm the district court's denial of the habeas petition.

## I.    BACKGROUND

### A.    Facts

Humphreys was arrested for the murders of Cynthia Williams and Lori Brown in November 2003. Jimmy Berry was appointed as trial counsel. After the state issued its notice of intent to seek the death penalty in February 2004, the Georgia Capital Defender's Office ("GCD") signed onto the case with its director,

Chris Adams, joining Berry.  The responsibility for Humphreys's case shifted over the course of four years, but Berry remained on the case the entire time.  Teri Thompson from GCD replaced Adams and worked on the case from January 2006 until June 2007.  At that time, Deborah Czuba (who had also been working on the case during the same period as Thompson) became the second-chair attorney.  Berry was first chair, presenting both the guilt and sentencing phases.

At trial, the evidence showed the following tragic facts relating to the murders of Williams and Brown:

> At approximately 12:40 p.m. on November 3, 2003, Humphreys, a convicted felon who was still on parole, entered a home construction company's sales office located in a model home for a new subdivision in Cobb County [Georgia].  Cindy Williams and Lori Brown were employed there as real estate agents. Finding Ms. Williams alone in the office, Humphreys used a stolen handgun to force her to undress and to reveal the personal identification number (PIN) for her automated teller machine (ATM) card.  After calling Ms. Williams's bank to learn the amount of her current balance, Humphreys tied her underwear so tightly around her neck that, when her body was discovered, her neck bore a prominent ligature mark and her tongue was protruding from her mouth, which had turned purple.  While choking Ms. Williams, Humphreys forced her to get down on her hands and knees and to move into Ms. Brown's office and behind Ms. Brown's desk.  Humphreys placed his handgun at

Ms. Williams['s] back and positioned a bag of bal-
loons between the gun and her body to muffle the
sound of gunshots.  He then fired a shot into her back
that went through her lung and heart, fired a second
shot through her head, and left her face-down on her
hands and knees under the desk.

Ms. Brown entered the office during or shortly
after Humphreys's attack on Ms. Williams, and he at-
tacked her too.  Ms. Brown suffered a hemorrhage in
her throat that was consistent with her having been
choked in a headlock-type grip or having been struck
in the throat.  Humphreys also forced Ms. Brown to
undress and to reveal her PIN, called her bank to ob-
tain her balance, and made her kneel with her head
facing the floor.  Then, while standing over Ms.
Brown, Humphreys fired one gunshot through her
head, this time using both a bag of balloons and Ms.
Brown's folded blouse to muffle the sound.  He
dragged her body to her desk, took both victims'
driver's licenses and ATM and credit cards, and left the
scene at approximately 1:30 p.m.  Neither victim sus-
tained any defensive wounds.

When the builder, whose office was located in
the model home's basement, heard the door chime of
the security system indicating that someone had ex-
ited the sales office, he went to the sales office to meet
with the [real-estate] agents.  There he discovered Ms.
Brown's body and called 911.  The responding police
officer discovered Ms. Williams's body.

After interviewing the builder and canvassing the neighborhood, the police released to the media descriptions of the suspect and a Dodge Durango truck seen at the sales office near the time of the crimes. In response, someone at the job site where Humphreys worked called to advise that Humphreys and his vehicle matched those descriptions and that Humphreys did not report to work on the day of the crimes. The police began to investigate Humphreys and made arrangements through his parole officer to meet with him on the morning of November 7, 2003. Humphreys skipped the meeting, however, and eluded police officers who had him under surveillance.

Humphreys was apprehended in Wisconsin the following day. Police there recovered from the console of his rental vehicle a Ruger 9-millimeter pistol, which was determined to be the murder weapon. Swabbings from that gun revealed blood containing Ms. Williams's DNA. A stain on the driver-side floormat of Humphreys's Durango was determined to be blood containing Ms. Brown's DNA.

After the murders, the victims' ATM cards were used to withdraw over $3,000 from their accounts. Two days after the murders, Humphreys deposited $1,000 into his account, and he had approximately $800 in cash in his possession when he was arrested. Humphreys claimed in a statement to the police that he did not remember his actions at the time of the crimes. However, when asked why he fled, he

said: "I know I did it.  I know it just as well as I know
my own name."  He also told the police that he had
recently taken out some high-interest "payday" loans
and that he "got [in] over [his] head with that stinking
truck."

*Humphreys v. State*, 694 S.E.2d 316, 322–23 (Ga. 2010).

Humphreys was convicted on September 25, 2007, in the Su-
perior Court of Cobb County, Georgia, of two counts each of mal-
ice murder, felony murder, aggravated assault, kidnapping, and
armed robbery in connection with the murders of the two women
at their workplace.  Defense counsel then presented evidence of
mitigation during the sentencing phase.  Trial counsel's mitigation
strategy was to show that Humphreys suffered severe and frequent
physical abuse as a child and suffered from Asperger's Syndrome.
On September 30, 2007, after a sentencing hearing, the same jury
found the existence of several statutory aggravating circumstances
and recommended a sentence of death.  The trial court imposed
death sentences for each murder.

### B.    *Jury Selection and Deliberations*

Much of Humphreys's petition centers on the selection of a
particular individual as a juror, Linda Chancey, and her interaction
with other jurors during the sentencing phase.  To explain Hum-
phreys's claim, we must first discuss the jury-selection process and
the jury's deliberations.  We note from the outset, though, that
most of this information comes from post-sentencing interviews

of jurors that the trial court later found to be inadmissible and the Supreme Court of Georgia agreed.

During jury selection, prospective juror Linda Chancey stated on a questionnaire that she had been the victim of an armed robbery and attempted rape. Both the questionnaire and her voir dire testimony revealed that her assailant was a convicted murderer who had escaped from a mental hospital. When the prosecution asked her about the incident during voir dire, Chancey said that her assailant "actually didn't do [her] any physical bodily harm. [She] was able to escape before he ever actually physically entered the dwelling, so it was preempted." Chancey further attested that her prior experience would not prevent her from sitting as a fair juror and that she felt she could listen to the evidence and follow the law. Defense counsel did not ask any follow-up questions. Nor did he challenge Chancey for cause or bias, even though the defense had a preemptory strike remaining. Chancey was seated on the jury.

In contrast to her answers during the voir dire process, Chancey apparently told the other jurors during deliberations that her assailant actually breached her home and attacked her. In an unsworn statement, another juror stated that Chancey told the jurors she "had been attacked in her bed in her apartment. [She] was naked in her bed and a man broke in and attacked her. [She] ran into the halls of her apartment and finally someone opened the door." When jurors asked Chancey if she told the attorneys this, she said she hadn't thought about it. After trial, investigators for Humphreys went to Chancey's home to conduct an interview.

Chancey told them that "a strange man came in through the window of her apartment, robbed her, and tried to rape her." Based on these circumstances, Humphreys contends Chancey lied during voir dire.

Humphreys also asserts that Chancey bullied other jurors into voting for a death sentence. Deliberations were contentious and lengthy. According to Susan Barber, the jury foreperson, from "day one, [Chancey] had her mind made up: early in the trial – before the end of the first phase – she said something along the lines of he's guilty and he deserves to die." Chancey later stated that she "would only vote for death." Following the presentation of evidence during sentencing, initially, three jurors—Susan Barber, Alma Pogue, and Tara Newsome—believed that Humphreys should receive life without parole and indicated they wouldn't vote for death (resulting in a vote of 9-3 in favor of death). It became apparent that two of the jurors (Barber and Pogue) were set on a life sentence (resulting in a vote of 10-2), so two male jurors began trying to convince the other eight jurors to change their votes from death to life without parole. Later, the jurors agreed that they would unanimously vote for life without parole, but when the jurors tallied their votes, Chancey voted for death. At that point, the vote was 11-1 in favor of life without parole. The deliberations continued and became quite heated, eventually resulting in a verdict for death.

A post-trial investigation revealed some jurors claimed that Chancey yelled and cursed at others during deliberations. Chancey

herself agreed that the deliberations in the penalty phase were "volatile" with screaming and raised voices, and at one point, another juror "took a swing" at Chancey and punched a hole in the wall. Chancey went through the crime-scene photos, threw them on the table and showed them to the other jurors and asked them, "[D]o you want this to happen to someone you know?  And Chancey yelled at the other jurors that she intended to "stay here till forever if it takes it for [Humphreys] to get death."  Chancey also "put her feet up on the table and said that she was digging in and she would not change her vote."  She told the others that "they had to reach a unanimous decision or [Humphreys] would be paroled."

After deliberating for approximately eight hours over a period of two days, Jury Foreperson Barber, wrote a note to the court which stated as follows:

> We, the jury, have agreed on statutory aggravating circumstances on both counts, but not on the penalty. While we agreed that life imprisonment with parole is not an option, we are unable to come to a *unanimous* decision on either death or life imprisonment without parole as a sentence.  Please advise.

(emphasis added).  Before Barber provided the note to the court, however, Chancey, added the word "currently."  Barber re-wrote the note and the version sent to the court stated as follows:

> We, the jury, have agreed on statutory aggravating circumstances on both counts, but not on the penalty. *Currently* we agreed life imprisonment with parole is not an acceptable option.  We are *currently* unable to

form a *unanimous* decision on death or on life imprisonment without parole.  Please advise.

(emphasis added).

Chancey said she revised the note because she did not want to give the court the impression that the jury was at an impasse. She believed the manner in which Barber originally wrote the note could have resulted in a mistrial, which she said she "wasn't going to let [] happen."[1]  The court placed the note in the record but did not read it aloud, instead summarizing its contents for the parties and letting them know that the court intended to instruct the jury to keep deliberating.[2]  At that time, the trial court told the jury, "[Y]ou need to continue with your deliberations, and address the remaining issues."

Humphreys points out that under controlling law at the time, if the jury failed to reach a unanimous decision on the death penalty, the court would have imposed a sentence of life without

---

[1] Chancey said that if a mistrial were declared, the jury would either have to "do it over again" or Humphreys "would get parole and hunt the jurors down."

[2] The court summarized the contents of the note as follows:

> [The jurors have] indicated that they have reached a verdict in regard to some of the issues that have been submitted to them, but have not yet reached a decision on other issues that were submitted to them.

*Humphreys*, 694 S.E.2d at 331.

the possibility of parole.  *See* O.C.G.A. § 17-10-31.1(c) (repealed by Ga. L. 2009 p.223, § 6, effective April 29, 2009).[3]

Rather than informing the jury about this statute, the trial court told the jury to continue deliberating after receiving its note. When the jury did so, the deliberations became quite heated with Chancey "yell[ing]" at and making personal attacks on the other jurors.  Chancey also apparently used her prior experience as a victim of a crime to pressure the other jurors to impose the death penalty.   As we've described, Chancey shared a version of her

---

[3] The then-relevant statutory section provided as follows:

> Where a jury has been impaneled to determine sentence and the jury has unanimously found the existence of at least one statutory aggravating circumstance *but is unable to reach a unanimous verdict as to sentence*, the judge shall dismiss the jury and *shall impose a sentence of either life imprisonment or imprisonment for life without parole*.  In imposing sentence, the judge may sentence the defendant to imprisonment for life without parole only if the court finds beyond a reasonable doubt that the defendant committed at least one statutory aggravating circumstance and the trial court has been informed by the jury foreman that upon their last vote, a majority of the jurors cast their vote for a sentence of death or for a sentence of life imprisonment without parole; provided, however, that the trial judge may impose a sentence of life imprisonment as provided by law.

§ 17-10-31.1(c) (emphases added).

assault that included a much closer encounter with her attacker than she had shared during voir dire.

Following three more hours of deliberations, Foreperson Barber sent a second note to the court asking that the jurors be allowed to rehear a taped statement that Humphreys had given to law enforcement. *See Humphreys*, 694 S.E.2d at 32. After listening to the recording, the jury resumed deliberations for approximately two more hours, at which point, defense counsel moved for a mistrial. *Id*. The trial court denied the motion, finding that the jury had not indicated it was deadlocked. *Id*.

Another two hours of deliberations passed, and Barber sent yet another note to the court. This one read, "Due to the hostile nature of one of the jurors, I am asking to be removed from the jury." The trial court read the note to the parties and informed them that it intended to give the jury a modified *Allen*[4] charge. Defense counsel renewed its motion for a mistrial, but the trial court again denied the motion. The judge brought the jury into the courtroom and issued the following charge:

> The Court deems it advisable at this time to give you some instruction in regard to the manner in which you should be conducting your deliberations in the case. You've been deliberating upon this case for a period of time. The Court deems it proper to advise

---

[4] *See Allen v. United States*, 164 U.S. 492 (1896).

you further in regard to the desirability of agreement, if possible.

The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict, if possible, and not for disagreement. *It is the law that a unanimous verdict is required.*

While this verdict must be the conclusion of each juror independently, and not a mere acquiescence of the jurors in order to reach an agreement, it is nevertheless necessary for all the jurors to examine the issues and the questions submitted to them with candor and with fairness and with a proper regard for in [sic] deference to the opinion of each other.

A proper regard for the judgment of others will greatly aid us in forming our own judgment. Each juror should listen with courtesy to the arguments of the other jurors with the disposition to be convinced by them.

If the members of the jury differ in their view of the evidence, the difference of opinion should cause them all to scrutinize the evidence more carefully and closely and to reexamine the grounds of their own opinion.

Your duty is to decide the issues that have been submitted to you if you can consci[enti]ously do so. In conferring, you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for hostility or taking up and maintaining in a spirit of controversy either side of the cause.

> You should bear in mind at all times that, as ju-
> rors, you should not be advocates for either side of
> the case. You should keep in mind the truth as it ap-
> pears from the evidence, examined in the light of the
> instructions that the Court has given to you.

> You may, again, retire to the jury room for a
> reasonable time, examine your differences in a spirit
> of fairness and candor and courtesy, and try to arrive
> at a verdict if you can conscientiously do so. At this
> time, you may return to the jury room.

(emphases added).

Later interviews with the jurors revealed that Foreperson
Barber and other jurors took from this instruction that the jury's
decision on sentencing must be unanimous. And they believed if
they were deadlocked, Humphreys would get life imprisonment
with the possibility of parole or that he could "walk." After receiv-
ing the third note, the court did not ask why Barber wished to be
removed from the jury. And Barber later explained that she did not
believe it was an option to send another note to the court stating
that the jury was deadlocked since "[t]he judge had made it clear
that it didn't matter: [the jury] didn't have a choice other than to
be unanimous." That day, the jury deliberated for an additional
two hours before retiring for the evening at 10:20 p.m.

The next day, when the jury resumed deliberations, Foreper-
son Barber decided to "fight for [a sentence of] life without pa-
role." At that point in the deliberations, Foreperson Barber and
Juror Pogue were the only two not voting for death. Despite

Barber's intent to fight, Chancey would "not engage in debate at all." The parties could hear "screaming" coming from the jury room. Barber became "extremely distressed and locked [herself] in the bathroom and cried." She later expressed that she felt they had run out of options because she "thought that unanimity was our only choice." Pogue deferred to Barber as to whether to "stick it out" but the two finally relented, and after two hours of deliberations, the jury returned two death sentences because they "didn't want Mr. Humphreys to go free."

Barber expressed that she believed she "had absolutely no other option . . . [She] cried the entire time. [She said] [i]t was one of the hardest things [she had] ever done because [she] was not true to [her] own belief about what the proper sentence should be." Barber also said if she had known that "not being unanimous meant a sentence of life without parole in this case, it would have been easy to stand [her] ground as long as [she] needed to."

On September 30, 2007, the jury found the existence of several statutory aggravating factors and recommended that Humphreys be executed.[5] The trial court ultimately imposed two death sentences for the murders of Williams and Brown.

_____

[5] One of the five aggravating factors found by the jury is set forth in O.C.G.A. § 17-10-30(b)(10), which provides that a jury may impose a death sentence when the "murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." The Supreme Court of Georgia later found that the

*C.     Post-trial Proceedings*

### 1.    Motion for New Trial

After interviewing some jurors, who revealed the circumstances we've noted, Humphreys's trial counsel filed a motion for new trial.  Although defense counsel raised various grounds in the motion, they did not raise a claim of juror misconduct.  Instead, counsel challenged the trial court's *Allen* charge, claiming it led jurors to erroneously believe that they were required to reach a unanimous decision.  In support of the claim, Humphreys submitted the affidavits of Juror Darrell Parker and two investigators.  *See Humphreys*, 694 S.E.2d at 333.

The trial court denied the motion for new trial.  Among other conclusions, the trial court determined that both the juror and investigator affidavits were inadmissible under O.C.G.A. § 17-9-41 and did not fall under any exception.    That statutory section provided that the "[a]ffidavits of jurors may be taken to sustain but not to impeach their verdict."  The trial court explained that exceptions to the rule are allowed "where extrajudicial and prejudicial information has been brought to the jury's attention improperly, or where non-jurors have interfered with the jury's deliberations."  The trial court determined that the affidavits did not offer any evidence of extrajudicial prejudicial information improperly brought

---

jury's reliance on O.C.G.A. § 17-10-30(b)(10) as an aggravating factor was improper but still affirmed the death sentence.

to the jury's attention or allege any non-juror interference had occurred. Accordingly, the court concluded that the affidavits did not fall into any exception to § 17-9-41 and could not be considered.

Regarding the *Allen* charge, the trial court looked to the decision in *Walker v. State*, 635 S.E.2d 740, 748 (Ga. 2006). There, the defendant made a similar claim of error because, during the sentencing phase, the jury was told, "[Y]our verdict as to penalty must be unanimous" and it was directed to continue deliberating after the jury told the trial court that it could not reach a unanimous verdict. *Id*. The trial court pointed out that in *Walker*, the Supreme Court of Georgia rejected the claim of error since Georgia law expects a jury to consider all the evidence and attempt to reach unanimity on the issue of sentence, and, if possible, unanimously recommend a sentence. Based on *Walker*, the trial court rejected Humphreys's *Allen*-charge claim and ultimately denied the motion for new trial.

2.    Direct Appeal

In Humphreys's direct appeal, he again raised the issue of the *Allen* charge and again omitted any claim of juror misconduct. He argued that the portion of the instruction that stated that "[i]t is the law that a unanimous verdict is required" was an incorrect statement of the law in the sentencing phase of a death-penalty case and misled the jurors. *Humphreys*, 694 S.E.2d at 332–33. The Supreme Court of Georgia disagreed, affirming Humphreys's convictions and sentences. *Id*. at 334−36.

The Supreme Court of Georgia also agreed with the trial court's ruling that the juror and investigator affidavits were inadmissible under O.C.G.A. § 17-9-41.  *Id*. at 333.  Thus, it upheld the trial court's decision to exclude the juror and investigator affidavits when analyzing the alleged coerciveness of the *Allen* charge.  *Id*. (citing *Gardiner v. State*, 444 S.E.2d 300 (Ga. 1994) and noting that exceptions to § 17-9-41 exist but do not include juror's misapprehension regarding the law).

The Supreme Court of Georgia then turned to the issue of whether the *Allen* charge was "so coercive as to cause a juror to 'abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors.'"  *Id*. at 333−34 (quoting *Mayfield v. State*, 578 S.E.2d 438, 443 (2003)).  The Court concluded it was not.  *Id*. at 334.

Still, the Court recognized that the charge could lead to claims of jury confusion that require an analysis of the circumstances of the jury instructions given.  *Id*.  It then analyzed the charge in Humphreys's case and found that the challenged "unanimity" language was just a "small portion of the extensive *Allen* charge given."  *Id*.  The court determined that the overall charge passed muster.  It explained,

> [The overall *Allen* charge] [c]autioned the jurors that the verdict was not to be the . . . mere acquiescence [of the jurors] in order to reach an agreement, that any difference of opinion should cause the jurors to scrutinize the evidence more [carefully and] closely and that the aim was to keep the truth in view as it

appeared from the evidence, considered in light of the
court's instructions.

*Id.* (cleaned up).

The Court also noted that after the publication of the ver-
dicts, the jury was polled. *Id.* At that time, each juror affirmed that
the verdicts announced were the verdicts that they had reached and
that each juror had reached the verdicts without pressure from an-
yone during deliberations. *Id.* Ultimately, the Court concluded the
*Allen* charge did not unduly coerce the jury into rendering a death
sentence because the "unanimous verdict" language was required
and was "one small portion of an otherwise balanced and fair *Allen*
charge." *Id.* But because potential problems existed with the *Allen*
charge that could result in claims of jury confusion, the Court in-
structed future trial courts "to omit this language from *Allen*
charges given during the sentencing phase of death penalty trials."
*Id.*

The Supreme Court of the United States denied Hum-
phreys's petition for writ of certiorari on November 15, 2010. *See
Humphreys v. Georgia*, 562 U.S. 1046 (2010).

### D. Habeas Proceedings

1. <u>State Habeas Petition</u>

Humphreys filed a petition for writ of habeas corpus in the
Superior Court of Butts County on February 14, 2011. He later
amended that petition to include twenty-one claims for relief. As
relevant here, Humphreys contended that (1) trial counsel were

ineffective in their mitigation investigation and presentation; (2) his constitutional rights were violated as a result of juror misconduct; (3) the manner in which the trial court handled the jury deadlock and *Allen* charge was erroneous; and (4) appellate counsel's failure to adequately litigate these claims during the motion for new trial and direct appeal also deprived him of due process.

The state habeas court held an evidentiary hearing in February 2013. At that hearing, Humphreys's new counsel presented both affidavits and live testimony of jurors, the substance of which we have already set forth. Humphreys also submitted evidence during the habeas proceedings that painted a somewhat different picture of his childhood than the one presented to the sentencing jury—including the fact that he had been sexually abused by his great grandmother.

When addressing the juror-misconduct claim, the state habeas court recognized the claim included assertions that Chancey (1) was not forthcoming during voir dire about her experience as a victim of violent crime and her willingness to consider a sentence other than death; (2) pressured and bullied other jurors into voting for a death sentence, refused to deliberate, and used the *Allen* charge to convince other jurors that they had to reach a verdict; and (3) altered a note to the trial court to mislead it about the status of deliberations. In support of these claims, Humphreys offered the affidavits of three jurors—one of which was filed in support of the motion for new trial. Humphreys also offered the live testimony of Foreperson Barber.

In denying relief, the state habeas court first found the juror-misconduct claims to be procedurally defaulted under O.C.G.A. § 9-14-48(d) because Humphreys failed to raise them in the motion for new trial or on direct appeal. It also determined that Humphreys had not overcome the procedural default because he showed neither cause for failing to raise the issue nor actual prejudice as a result of appellate counsel's failure to raise these claims. In conducting this analysis, the state habeas court acknowledged that Humphreys sought to rely on juror affidavits and Foreperson Barber's testimony but found them to be inadmissible under O.C.G.A. § 17-9-41, O.C.G.A. § 9-10-9, and Georgia law.[6] Humphreys presented no other evidence of Chancey's alleged bias or misconduct, so in the absence of the jurors' affidavits and Barber's live testimony, nothing was left to support a valid challenge for cause by defense counsel. The state habeas court further determined that even if it considered the juror testimony, Humphreys still failed to show any resulting prejudice.

As for the ineffective-assistance-of-trial-counsel claim, the court began by thoroughly detailing trial counsel's qualifications, the mitigation investigation counsel conducted, and counsel's presentation of evidence and experts during the sentencing phase. The court concluded that trial counsel were not ineffective in their presentation of mitigation evidence, and it determined that, in

---

[6] The state habeas court acknowledged both the juror affidavits and Barber's live testimony and grouped them together, referring to them as "testimony."

particular, counsel were not ineffective for not presenting allegations that Humphreys's great grandmother had sexually abused him. In support of this conclusion, the court noted that the defense team had questioned Humphreys about sexual abuse, and Humphreys had failed to disclose any such abuse.

The state habeas court also determined that trial counsel's investigation and presentation of mental-health and other mitigating evidence were reasonable. The only "new" evidence Humphreys presented at the habeas hearing was of sexual abuse, but Humphreys did not disclose it to trial counsel or anyone else when asked, so, the court concluded, trial counsel could not be faulted for failing to discover it.

Not only that, but the court determined that Humphreys failed to show the requisite *Strickland* prejudice. As the court reasoned, the additional evidence presented to it during the habeas evidentiary hearing would not have created a reasonable probability of a different outcome had it been presented originally. That was so, the court reasoned, because the majority of the evidence presented in habeas proceedings (mostly having to do with physical abuse, poor living conditions, and mental-health assessments) reiterated the testimony presented during sentencing. Indeed, the court concluded that much of the testimony from both lay witnesses and expert witnesses during the habeas proceedings was cumulative. In the end, the court weighed the totality of the aggravating evidence against the totality of the mitigating evidence and

announced that "any additional mitigating testimony would not have created a reasonable probability of a different outcome."

Rounding out its decision, the state habeas court addressed Humphreys's claim that the trial court improperly instructed the jury on the principle of unanimity in capital sentencing—the *Allen* charge claim. Humphreys candidly acknowledged that the Supreme Court of Georgia had already reviewed and rejected the claim, but he asserted that the Court had erred in its legal conclusions. The state habeas court noted that it did not review in a habeas proceeding issues raised and litigated on direct appeal. And because Humphreys had failed to advise the state habeas court about any changes in the law, the court determined the claim was precluded from review under the doctrine of *res judicata*.

In sum, the state habeas court denied Humphreys's petition in its entirety.

2.    <u>Supreme Court of Georgia's Denial of Certificate of Probable Cause to Appeal</u>

Humphreys filed an application for certificate of probable cause to appeal with the Supreme Court of Georgia. That court denied the entirety of the application, finding that it lacked any arguable merit.

Humphreys filed a petition for writ of certiorari, which the Supreme Court of the United States denied on April 16, 2018.

3.    <u>Federal Habeas Petition (§ 2254 Petition)</u>

Humphreys filed a petition for writ of habeas corpus pursu-
ant to 28 U.S.C. § 2254 in the United States District Court for the
Northern District of Georgia. He later amended the petition.

On September 16, 2020, the district court issued a final order
denying relief on all claims and dismissed the petition with preju-
dice, except as to a challenge not applicable here. The district court
granted Humphreys a COA on the issue of whether his trial coun-
sel was ineffective in investigating and presenting his case in miti-
gation during the penalty phase of his trial.

4.      Notice of Appeal and Motion to Expand COA

Humphreys timely filed his notice of appeal with this Court
and later sought an expansion of the COA to include six additional
claims of constitutional error. We granted the motion in part and
permitted Humphreys to appeal four claims as follows: (1) whether
Humphreys is entitled to relief from the denial of his habeas
petition on his claim that juror bias and misconduct deprived him
of his constitutional rights; (2) whether Humphreys is entitled to
relief from the denial of his habeas petition on his claim that the
trial judge gave inaccurate, misleading, or coercive instructions
and inadequately responded to juror misconduct; (3) whether
Humphreys is entitled to relief from the denial of his habeas pe-
tition on his claim that he was denied his Sixth Amendment right
to effective assistance of counsel by appellate counsel; and (4)

whether his trial counsel was ineffective in investigating and presenting his case in mitigation during the penalty phase of his trial.

The parties fully briefed these issues, and we heard oral argument.

## II.    STANDARD OF REVIEW

This Court reviews "de novo the denial of a petition for a writ of habeas corpus." *Morrow v. Warden*, 886 F.3d 1138, 1146 (11th Cir. 2018) (quotation omitted). But the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs our review of federal habeas petitions and prescribes a highly deferential framework for evaluating issues previously decided in state court. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1034 (11th Cir. 2022) (en banc); *Sealey v. Warden, Ga. Diagnostic Prison*, 954 F.3d 1338, 1354 (11th Cir. 2020). Under AEDPA, we may not grant habeas relief on claims that were "adjudicated on the merits in [s]tate court" unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." *Sealey*, 954 F.3d at 1354 (quoting 28 U.S.C. § 2254(d)). These standards mean that we must give state-court decisions "the benefit of the doubt." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1325 (11th Cir. 2013) (citation and internal quotation marks omitted).

A state-court decision is not "contrary to" federal law under 2254(d)(1) "unless it contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." *Id.* (citation and internal quotation marks omitted); *see also Williams v. Taylor*, 529 U.S. 362, 405 (2000).

And a state-court decision is not an "unreasonable application" of federal law under 2254(d)(1) "unless the state court identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply." *Evans*, 703 F.3d at 1325 (citation and internal quotation marks omitted); *see also Williams,* 529 U.S. at 407 (a state court decision is an "unreasonable application" of clearly established law if the state court identifies the correct governing legal rule from the Supreme Court's holdings but unreasonably applies it to the facts of the particular defendant's case).

Regarding AEDPA's unreasonable-application-of-federal-law provision under 2254(d)(1), "[t]he key word is 'unreasonable,' which is more than simply incorrect." *Sealey*, 954 F.3d at 1354. To meet this standard, "a prisoner must show far more than that the state court's decision was merely wrong or even clear error." *Pye*, 50 F.4th at 1034 (quoting *Shinn v. Kayer*, 141 S. Ct. 517, 523 (2020) (per curiam) (quotation marks omitted)).  "[A] state court's

application of federal law is unreasonable only if no fairminded jurist could agree with the state court's determination or conclusion." *Raulerson v. Warden*, 928 F.3d 987, 995–96 (11th Cir. 2019) (citations and internal quotation marks omitted). This is "a difficult to meet and highly deferential standard . . . , which demands that state-court decisions be given the benefit of the doubt." *Id.* at 996 (citation and internal quotation marks omitted). Still, AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (citations and internal quotation marks omitted).

For each claim presented, we review "the last state-court adjudication on the merits." *Greene v. Fisher*, 565 U.S. 34, 40 (2011). If the state court did not reach the merits of the claim, though, "federal habeas review is not subject to the deferential standard that applies under AEDPA[.]" *Cone v. Bell*, 556 U.S. 449, 472 (2009). Rather, in that case, we review the claim de novo. *Id.* The Supreme Court has instructed us to presume "the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011) (citation omitted). An indication to the contrary exists when, for example, the state court has denied the petitioner's claim on only one prong of the *Strickland* test. In that case, we review de novo the prong that the state court never reached. *See,*

*e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 380, 390, (2005); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

We also defer to a state court's determination of the facts under 2264(d)(2) unless the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Section 2254(d)(2) is similar to § 2254(d)(1) in that it requires us to give state courts "substantial deference." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015). "We may not characterize . . . state-court factual determinations as unreasonable 'merely because we would have reached a different conclusion in the first instance.'" *Id*. at 313–14 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (alteration adopted). We also presume that the state court's factual determinations are correct, absent clear and convincing evidence to the contrary. *Pye*, 50 F.4th at 1035; 28 U.S.C. § 2254(e)(1).

If the petition satisfies § 2254(d)'s requirements, we then consider whether the state court's error was harmless. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In collateral-review cases, a federal constitutional error is harmless unless it caused "actual prejudice." *Id*. at 637 (citation omitted). Put another way, we examine "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id*. at 623, 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *See also Brown v. Davenport*, 596 U.S. 118, 122 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this

Court outlined in *Brecht* and the one Congress prescribed in AEDPA.").

## III.    DISCUSSION

### A.    *Juror Misconduct*

Humphreys contends that juror misconduct infected the trial from voir dire all the way through jury deliberations, resulting in a violation of his due-process rights.  He points to the following as evidence of Chancey's misconduct: (1) lying during voir dire about her experience as a victim of a crime and her unwillingness to consider a sentence other than death; (2) intimidating other jurors and refusing to deliberate; and (3) altering a note to the trial court to mislead it about the status of deliberations.

According to Humphreys, Chancey vacillated between refusing to deliberate and berating other jurors, and she admitted that she would vote for only a death sentence.  Humphreys also emphasizes that during deliberations, Chancey revealed that she had been dishonest during voir dire about the home invasion and attempted rape.  Had Chancey revealed that information during jury selection, Humphreys asserts, the defense would have stricken her.  Humphreys further takes issue with what he deems to be Chancey's "bullying" and coercion of the other jurors.  He contends that, paired with the trial court's *Allen* charge, Chancey's conduct caused at least one juror—Barber—to surrender her honestly held beliefs about the appropriate sentence.  Finally, Humphreys characterizes Chancey's alteration of the jury note by inserting the

word "currently" as an attempt to mislead the trial court that the jury was not deadlocked.

The state habeas court concluded Humphreys procedurally defaulted these claims because he failed to raise them in his motion for new trial or on direct appeal. The Supreme Court of Georgia and the district court agreed.

The issue of whether a claim is subject to the doctrine of procedural default "is a mixed question of fact and law, which we review *de novo*." *Ward v. Hall*, 592 F.3d 1144, 1175 (11th Cir. 2010) (citation and internal quotation marks omitted).

The doctrine of procedural default bars a court from reviewing a petitioner's claim when that claim has been or would be rejected in state court on a state procedural ground. *See Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001). We have explained,

> Federal habeas review reduces the finality of litigation and frustrates states' sovereign power to punish offenders and states' good-faith attempts to honor constitutional rights. So, when a state prisoner fails to follow state procedural rules, thereby procedurally defaulting on the claim, our authority to review the prisoner's state court criminal conviction is severely restricted. Federal review of a petitioner's claim is barred by the procedural-default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, and that bar provides an adequate and independent state ground for denying relief.

*Atkins v. Singletary*, 965 F.2d 952, 956 (11th Cir. 1992) (citations and internal quotation marks omitted). Because the state habeas court concluded that Humphreys procedurally defaulted his claims about Chancey, those claims are also likely barred from review in this proceeding.

Still, we have recognized that a petitioner may obtain federal review of a procedurally defaulted claim if he can show both "cause" for the default and actual "prejudice" resulting from the default. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003) (citing *Murray v. Carrier,* 477 U.S. 478, 485 (1986), and *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977)). To establish "cause," a petitioner "must demonstrate that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Id.* (quoting *Wright v. Hopper,* 169 F.3d 695, 703 (11th Cir.1999)); *Mize v. Hall*, 532 F.3d 1184, 1190 (11th Cir. 2008) ("Cause exists if there was 'some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule.'" (quoting *Murray,* 477 U.S. at 488)). To establish prejudice, a petitioner must show that "there is at least a reasonable probability that the result of the proceeding would have been different." *Henderson*, 353 F.3d at 892 (citing *Wright*, 169 F.3d at 703, and *Crawford v. Head*, 311 F.3d 1288, 1327−28 (11th Cir. 2002)).

We have further explained that a federal court may also grant a habeas petition on a procedurally defaulted claim, without a showing of cause or prejudice, to "correct a fundamental miscarriage of justice." *Id.* (citing *Murray,* 477 U.S. at 495−96). A

fundamental miscarriage of justice occurs only in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent. *Id.* (citing *Murray*, 477 U.S. at 495–96).

Here, Humphreys does not claim actual innocence, so he must establish cause and prejudice to overcome the procedural bar to his juror-misconduct claim. He says he can demonstrate cause for the default because his appellate counsel was ineffective for failing to raise the claims about Chancey's conduct earlier. So embedded in Humphreys's juror-misconduct claim is his separate claim that his appellate counsel was ineffective.

For the reasons we explain below, we disagree with Humphreys that his appellate counsel was ineffective. We therefore deny that separate claim. And because Humphreys cannot show that his counsel was ineffective, he also cannot show cause for the procedural default of the juror-misconduct claim, so we deny that claim, too.

1.    *Strickland* Standard

When a federal habeas petitioner alleges ineffective assistance of counsel, as here, the relevant law "as determined by the Supreme Court" is *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail on an ineffective-assistance claim under *Strickland*, a petitioner must show that (1) his "counsel's representation fell below an objective standard of reasonableness" and (2) a reasonable probability "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687–88, 694. We

can resolve an ineffectiveness claim on either ground if a petitioner cannot prove both. *Atkins*, 965 F.2d at 959; *see also Strickland*, 466 U.S. at 697. A reasonable probability of a different outcome is a probability "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. It is not enough for the defendant to show that the errors had "some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, defense counsel's errors must be "so serious" that they deprived the defendant of a "fair trial, a trial whose result is reliable." *Id.* at 687.

When we assess counsel's performance, we must avoid viewing their decisions through the "distorting effects of hindsight." *Id.* at 689. We must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* The defendant bears the burden to show that counsel made errors "so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687. He must show that the attorney's representation amounted to incompetence under prevailing professional norms. *Id.* at 690. As we have explained, "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done." *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) (citation and internal quotation marks omitted). Instead, the inquiry is whether counsel's actions were "so patently unreasonable that no competent attorney would have chosen [them]." *Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987) (per curiam) (citation and internal quotation marks omitted).

And when we apply AEDPA deference on top of *Strickland* deference, we may reject a state-court finding that trial counsel was adequate only upon the dual-determination that counsel acted in a professionally unreasonable manner (under *Strickland*) and that the state court's contrary determination was "objectively unreasonable" (under § 2254). It is a "rare" circumstance when a federal court finds in favor of a habeas petitioner on both accounts. *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 910–11 (11th Cir. 2011).

2.     Admissibility of Juror Testimony

Because Humphreys's ineffective-assistance claim is premised on the evidence contained in the affidavits and testimony counsel obtained about juror deliberations, Humphreys can establish the necessary "cause" to avoid procedural default of his juror-misconduct claims only if that evidence is admissible. The state habeas court refused to consider that evidence, finding it to be inadmissible. Previously, both the trial court and Supreme Court of Georgia had reached the same conclusion with respect to Humphreys's claim that the *Allen* charge was coercive.

Humphreys acknowledges that the lower courts, relying on Georgia law, refused to consider the juror statements. In Georgia, in general, jurors may not impeach their own verdict. *O'Donnell v. Smith*, 751 S.E.2d 324, 327 (Ga. 2013); *see also Henley v. State*, 678 S.E.2d 884, 887 (Ga. 2009) ("[A] jury verdict may not be challenged based on an affidavit from one or more jurors."). Indeed, former O.C.G.A. § 17-9-41 (repealed by Ga. L. 2011, Act 52, § 33, effective January 1, 2013), referred to as the "no-impeachment rule,"

provided that "[t]he affidavits of jurors may be taken to sustain but not impeach their verdict."[7]  This rule applies equally to juror affidavits and live testimony by jurors, even in death-penalty cases.  *See Roebuck v. State*, 586 S.E.2d 651, 658 (Ga. 2003); *Oliver v. State*, 461 S.E.2d 222 (Ga. 1995); *Spencer v. State*, 398 S.E.2d 179 (Ga. 1990).  That said, this general rule cannot override a defendant's right to a fair trial.  *O'Donnell*, 751 S.E.2d at 327 (citing *Henley*, 678 S.E.2d at 888, and *Turpin v. Todd*, 493 S.E.2d 900 (Ga. 1997)).

Multiple exceptions to the general rule also exist: "when (1) prejudicial, extrajudicial information has been brought to the jury's attention; (2) nonjurors have interfered with deliberations; or (3) there has been irregular jury conduct so prejudicial that the verdict lacks due process."  *Tate v. State*, 628 S.E.2d 730, 732–33 (Ga. Ct. App. 2006); *see also Crowe v. Hall*, 490 F.3d 840, 846 (11th Cir. 2007).

Analogously, Federal Rule of Evidence 606(b) also generally precludes courts from relying on post-trial juror testimony during an inquiry into the validity of a verdict.  That rule provides, "During an inquiry into the validity of a verdict . . . , a *juror may not testify* about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment."  Fed. R. Evid. 606(b)(1) (emphasis added).  Because of this rule, a court may not consider a juror's affidavit or

---

[7] This statute was in place at the time of Humphreys's motion for new trial and direct appeal in 2008 and 2010, respectively.

testimony on these matters. *Id.* As with the Georgia rule, the federal rule contains exceptions. Under Federal Rule of Evidence 606(b)(2), a jury may testify about its verdict when "(A) extraneous prejudicial information was improperly brought to the jury's attention; (B) an outside influence was improperly brought to bear on any juror; or (C) a mistake was made in entering the verdict on the verdict form." Rule 606(b) reveals Congress's endorsement of a "broad no-impeachment rule, with only limited exceptions." *Pena-Rodriguez v. Colorado*, 580 U.S. 206, 217 (2017).

Rule 606(b) arose from the common-law rule against admitting jury testimony to impeach a verdict. In *Tanner v. United States*, the Supreme Court explained that "full and frank discussion in the jury room, jurors' willingness to return an unpopular verdict, and the community's trust in a system that relies on the decisions of laypeople would all be undermined by a barrage of postverdict scrutiny of juror conduct." 483 U.S. 107, 120–21 (1987). The Supreme Court has reasoned that Rule 606(b) "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their deliberations, and they will not otherwise be harassed or annoyed by litigants seeking to challenge the verdict. The rule gives stability and finality to verdicts." *Pena-Rodriguez*, 580 U.S. at 218.

Here, Humphreys does not claim that the verdict came as a result of external influences or a mistake in the verdict form. And "juror misconduct" is not an exception to the no-impeachment rule, so post-trial testimony from jurors regarding alleged

misconduct is not admissible under Federal Rule 606(b). *See Warger v. Shauers*, 574 U.S. 40 (2014); *Tanner*, 483 U.S. 107 (1987).

But Humphreys argues the state habeas court unreasonably refused to consider the juror testimony establishing Chancey's misconduct based on constitutional standards of fairness that require criminally accused defendants to enjoy a panel of fair and impartial jurors.

In Humphreys's view, the no-impeachment rule presupposes the existence of specific trial safeguards the Supreme Court recognized in *Tanner* that bring misconduct to light during the trial proceedings, eliminating the need for post-trial inquiries into deliberations. Those safeguards include (1) "[t]he suitability of an individual for the responsibility of jury service . . . is examined during voir dire[,]" (2) "[t]he jury is observable by the court, by counsel, and by court personnel[,]" (3) "jurors are observable by each other, and may report inappropriate juror behavior to the court *before* they render a verdict[,]" and] (4) "nonjuror evidence of misconduct." *Tanner*, 483 U.S. at 127; *See also Warger*, 574 U.S. at 51. But Humphreys contends the *Tanner* safeguards are not infallible and they sometimes fail to capture serious juror misconduct.

As Humphreys sees things, this is a "rare" case in which all four of the *Tanner* safeguards failed. And because the *Tanner* safeguards failed, the no-impeachment rule should yield and the state habeas court should have considered the juror testimony. He emphasizes the Supreme Court's acknowledgment that "[t]here may be cases of juror bias so extreme that, almost by definition, the jury

trial right has been abridged.  If and when such a case arises, the
Court can consider whether the usual safeguards are or are not suf-
ficient to protect the integrity of the process." *Warger*, 574 U.S. at
51 n.3.  Humphreys argues this is such a case.

       In short, Humphreys asserts Chancey's bias and miscon-
duct implicate his Eighth Amendment right to a fair and reasonable
sentencing determination and his due-process right to an impartial,
unbiased jury.  He says the no-impeachment rule should be
"stripped away" to preserve his rights and we should find the state
habeas court unreasonably refused to take that action.  Still, Hum-
phreys acknowledges that the Supreme Court has considered the
application of the no-impeachment rule in only a small number of
cases.  *See* Blue Brief at 69, n. 27 (citing *United States v. Reid*, 53 U.S.
361 (1851), *Mattox v. United States*, 146 U.S. 140 (1892), *McDonald v.
Pless*, 238 U.S. 264 (1915), *Tanner v. United States*, 483 U.S. 107 (1987),
*Warger v. Shauers*, 574 U.S. 40 (2014), and *Pena-Rodriguez v. Colorado*,
580 U.S. 206 (2017)).  But he asserts that *Pless, Tanner, Warger,* and
*Pena-Rodriguez* establish the lower courts' authority to review and
consider the juror testimony.

       Humphreys's argument is somewhat novel.  Indeed, the Su-
preme Court issued three of the cases he relies on—*Reid* (1851),
*Mattox* (1892), and *Pless* (1915)—before Congress adopted Rule
606(b) in 1975, which endorsed a broad no-impeachment rule, with
"limited exceptions."  *See Pena-Rodriguez*, 580 U.S. at 215–218.  And
although both *Reid* and *Pless* noted the possibility of an exception
to the no-impeachment rule in the "gravest and most important

cases[,]" *Pless*, 238 U.S. at 269, the Supreme Court has addressed this circumstance in only three cases—*Tanner*, *Warger*, and *Pena-Rodriguez*. *See Reid*, 53 U.S. at 366. Yet in only one of those cases—*Pena-Rodriguez*—did the Court actually allow an exception to the no-impeachment rule.

In *Tanner*, the Court rejected a Sixth Amendment exception for evidence that some jurors were under the influence of drugs and alcohol during the trial. *Tanner*, 483 U.S. at 125. In reaching this conclusion, the Court noted the "long-recognized and very substantial concerns" supporting "the protection of jury deliberations from intrusive inquiry." *Id*. at 127. In particular, the Court did not want attorneys to use juror testimony to attack verdicts because, the Court ruled, that would result in jurors being "harassed and beset by the defeated party," thus destroying "all frankness and freedom of discussion and conference." *Id*. at 120 (quoting *Pless*, 238 U.S. at 267–68). The Court also expressed concerns about attempts to impeach a verdict that would "disrupt the finality of the process" and undermine both "jurors' willingness to return an unpopular verdict" and "the community's trust in a system that relies on the decisions of laypeople." *Id*. at 120–21.

Besides identifying the problems with cracking open jury deliberations post-verdict, the Court emphasized the existing safeguards that protect the defendant's right to an impartial and competent jury beyond post-trial juror testimony, which we noted earlier. *Id*. at 127. Balancing the concerns and safeguards against the

defendant's Sixth Amendment interest, the Court affirmed the exclusion of affidavits about the jury's inebriated state.

*Warger* was a civil case. There, the Supreme Court again declined to recognize an exception to the no-impeachment rule. After the trial court entered the verdict, the losing party sought to proffer evidence that the jury forewoman failed to disclose pro-defendant bias during voir dire. *Warger*, 574 U.S. at 43. Like in *Tanner,* the Court relied substantially on existing safeguards for a fair trial. The Court stated, "Even if jurors lie in *voir dire* in a way that conceals bias, juror impartiality is adequately assured by the parties' ability to bring to the court's attention any evidence of bias before the verdict is rendered, and to employ nonjuror evidence even after the verdict is rendered." *Id*. at 51.

Still, the *Warger* Court reiterated that the no-impeachment rule may have exceptions. As in *Reid* and *Pless*, the Court warned of "juror bias so extreme that, almost by definition, the jury trial right has been abridged." *Id*. at 51 n.3. The Court announced, "If and when such a case arises," it would "consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Id*.

As it turned out, in *Pena-Rodriguez*, the Supreme Court encountered such a grave case. There, the Court held,

> where a juror makes a clear statement that indicates
> he or she relied on racial stereotypes or animus to
> convict a criminal defendant, the Sixth Amendment
> requires that the no-impeachment rule give way in

order to permit the trial court to consider the evi-
dence of the juror's statement and any resulting de-
nial of the jury trial guarantee.

*Pena-Rodriguez*, 580 U.S. at 225. Despite finding an exception, the
Supreme Court once again emphasized that its recognition in
*Warger*—that there may be extreme cases where the jury trial right
requires an exception to the no-impeachment rule—"must be in-
terpreted in context as a guarded, cautious statement." *Id*. at 221.
As the Court explained, such a begrudging exception was neces-
sary "to avoid formulating an exception that might undermine the
jury dynamics and finality interests the no-impeachment rule seeks
to protect." *Id*. But given that "racial animus was a significant mo-
tivating factor in [the juror's] finding of guilt," the Court held that
the Constitution required an exception to the no-impeachment
rule. *Id*. at 221, 225. That was so, the Court explained, because
such statements cast "serious doubt" on the fairness of the trial and
resulting verdict. *Id*. at 225.

Against this legal landscape, we cannot say that Hum-
phreys's appellate counsel acted unreasonably in refraining from
raising the juror-misconduct claims in the motion for new trial or
in the direct appeal. For starters, only *Pena-Rodriguez* has ever ap-
plied an exception to the no-impeachment rule. But that case in-
volved prejudice based on a protected status. And that type of bias
is in a category of its own. Plus, *Pena-Rodriguez* was not decided
until well after the motion for new trial and direct appeal were filed.
When counsel filed those documents, the Court had never recog-
nized an exception to the no-impeachment rule. In fact, counsel

didn't have the benefit of *Warger*, either, when moving for a new trial and filing the direct appeal.

That leaves *Reid, Pless,* and *Tanner.* To be sure, in *Reid* and *Pless*, the Supreme Court left the door open for a case in which juror bias was so severe that the right to a fair trial was abridged. But those cases did not give any concrete examples to guide counsel.

Here, Chancey allegedly revealed that she had lied during voir dire about the particulars of being a victim of a crime, bullied other jurors, was loud and unwilling to deliberate, and altered a note. The other jurors knew all these things during deliberations and could have brought them to the trial court's attention. They did not—even though Chancey was the only juror involved in the troubling conduct and even though Chancey's conduct did not involve racial bias. As the Supreme Court explained in *Pena-Rodriguez*, "[t]he stigma that attends racial bias may make it difficult for a juror to report inappropriate statements during the course of juror deliberations." 580 U.S. at 225. The same is not true here. So while we certainly understand and are concerned by Chancey's conduct, we cannot say that counsel unreasonably decided that it did not fall into a then-theoretical exception to the no-impeachment rule.

In short, appellate counsel's representation did not fall below an objective standard of reasonableness when counsel did not pursue the juror-misconduct claims in the motion for new trial or on direct appeal. Perhaps, some other lawyer may have pursued the claim. But the test is not what the best lawyer or even a good

lawyer would have done.  Not raising these claims was not "so patently unreasonable that no competent attorney would have chosen" counsel's actions.[8] *Kelly*, 820 F.2d at 1176.

Ultimately, because Humphreys has not shown that appellate counsel was ineffective for failing to pursue the juror-misconduct claims sooner, he cannot demonstrate the cause required to defeat the procedural default of those claims.  For this reason, we are barred from examining the merits of the juror-misconduct claims.  The claims are therefore denied.

---

[8] We recognize that appellate counsel submitted other affidavits in support of the *Allen* charge claim.  But that claim is markedly different because the affidavits made up only a small portion of the evidence supporting the claim.  The *Allen* charge claim was based on an amalgamation of the trial judge's own words, the jury notes to the court, the amount of time it took the jurors to deliberate, the yelling coming from the jury room, and other evidence.  In contrast, the juror-misconduct claims are based exclusively on the post-trial juror interviews, juror affidavits, and juror testimony.  In short, the entirety of the juror-misconduct claim is premised upon juror testimony—evidence that is inadmissible under the no-impeachment rule.  *See* Fed. R. Evid. 606(b) ("a juror may not testify about any statement made or incident that occurred during the jury's deliberations"); *see also Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247 (11th Cir. 2022); *Roebuck*, 586 S.E.2d at 658; *Oliver*, 461 S.E.2d at 223–24.  It was not unreasonable for counsel to refrain from pursuing those claims under Humphreys's novel theory where it was nearly a foregone conclusion that the only piece of evidence—the juror testimony—would not be considered and the court would be left with nothing to support the juror-misconduct claims.

B.    *Ineffective Assistance of Appellate Counsel*

Humphreys's     ineffective-assistance-of-appellate-counsel claim necessarily fails for the same reason that Humphreys cannot show cause for his procedural default: as we've explained, counsel did not act unreasonably when they did not pursue the juror-mis-conduct claims sooner. Consequently, we reject Humphreys's claim that his appellate counsel was ineffective under *Strickland*.

C.    *Allen Charge*

Humphreys also argues that the trial court coerced a sentencing verdict by instructing the jurors that "[i]t is the law that a unanimous verdict is required," by repeatedly returning them to the jury deliberation room despite their declaration of a deadlock, and by ignoring Foreperson Barber's plea to be excused "due to the hostile nature" of one of her fellow jurors. On direct appeal, the Supreme Court of Georgia found the trial court's instructions did not constitute coercion and the trial court's unanimity instruction was correct. *Humphreys*, 694 S.E.2d at 332−34.

Because the Supreme Court of Georgia adjudicated the coercion claim on the merits, it is entitled to AEDPA deference.[9] We

---

[9] Although the state habeas court briefly addressed the *Allen*-charge claim, it determined that it was barred from adjudicating it because the claim had already been litigated on direct appeal and could not be reviewed absent a change in the law. We therefore look to the decision of the Supreme Court of Georgia on direct appeal since it is the "last state-court adjudication on the merits" with respect to the *Allen*-charge claim. *Greene*, 565 U.S. at 40.

may grant relief on this claim only if the Supreme Court of Georgia's determination was (1) "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d).

Trial courts may not coerce juries into rendering verdicts. *See United States v. Davis*, 779 F.3d 1305, 1312 (11th Cir. 2015). And a defendant "being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). That said, the Supreme Court has held that a trial court may instruct a deadlocked jury to keep deliberating. *Id*. at 237 (citing *Allen v. United States*, 164 U.S. 492 (1896)). Therefore, "[i]n an *Allen* charge, the judge instructs a deadlocked jury to undertake further efforts to reach a verdict." *United States v. Chigbo*, 38 F.3d 543, 544 n.1 (11th Cir. 1994) (per curiam). Although we've acknowledged the potential for coercion in an *Allen* charge, we've also approved the use of the charge. *Rubinstein v. Yehuda*, 38 F.4th 982, 996–97 (11th Cir. 2022). Accordingly, district courts have broad discretion in issuing *Allen* charges but must take care to not "coerce any juror to give up an honest belief." *United States v. Anderson*, 1 F.4th 1244, 1269 (11th Cir. 2021) (quoting *Davis*, 779 F.3d at 1312).

We recently reiterated that "[c]oercion does not mean 'simple pressure to agree.'" *Sears v. Warden*, 73 F.4th 1269, 1301 (11th Cir. 2023) (per curiam) (quoting *Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019)). "Pressure becomes coercive when the

actions of the court result in 'a minority of the jurors sacrificing their conscientious scruples for the sake of reaching agreement.'" *Id.* (quoting *Brewster*, 913 F.3d at 1053)).

In our Circuit, whether a verdict was coerced presents a mixed question of law and fact. *Id.* We look at the language the trial court employed and "examine the totality of the circumstances to see if the court's actions created a substantial risk that one or more jurors would be coerced into abandoning their honest convictions." *Brewster*, 913 F.3d at 1053 (citing *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008)). The relevant, but not exhaustive, circumstances we consider include the following:

> (1) the total length of deliberations; (2) the number of times the jury reported being deadlocked and was instructed to resume deliberations; (3) whether the judge knew of the jury's numerical split when he instructed the jury to continue deliberating; (4) whether any of the instructions implied that the jurors were violating their oaths or acting improperly by failing to reach a verdict; and (5) the time between the final supplemental instruction and the jury's verdict.

*Id.* (citations omitted).

Here, the Supreme Court of Georgia concluded that the *Allen* charge, considered as a whole, was not coercive. *Humphreys*, 694 S.E.2d at 334. The court noted that it had previously considered the same "a unanimous verdict is required" instruction given as part of an *Allen* charge in the sentencing phase of a death-penalty

trial and found that it was technically a correct statement of the law. *Id.* (citing *Legare v. State*, 302 S.E.2d 351 (Ga. 1983)). Relying on *Legare*, the Supreme Court of Georgia explained that "it is true that any 'verdict' rendered [in the sentencing phase] must be unanimous and thus also true, stated in isolation, that it is 'the law that a unanimous verdict is required.'" *Id.* (quoting *Legare*, 302 S.E.2d at 353).

The Supreme Court of Georgia further expounded, noting that Georgia requires a unanimous verdict even in the sentencing phase of a capital case because under its death-penalty law, "[w]here a jury is unable to agree on a verdict, that disagreement is not itself a verdict." *Id.* (quoting *Romine v. State*, 350 S.E.2d 446, 451 (Ga. 1986)). As the court explained Georgia law, "[t]he jury's deadlock may lead to a sentence of life with or without parole imposed by the trial court, but it does not result either in a mistrial subject to retrial (as in other contexts where a jury deadlocks) or an automatic verdict (as occurs under the death penalty law of other states)." *Id.* (citing *Romine*, 350 S.E.2d at 451). Thus, the court emphasized, it had "repeatedly held that a trial court is not required to instruct the jury in the sentencing phase of a death penalty trial about the consequences of a deadlock." *Id.* (citing *Jenkins v. State,* 498 S.E.2d 502 (Ga. 1998)).

Still, the Supreme Court of Georgia recognized that the charge could lead to claims of jury confusion, requiring an analysis of the "circumstances of the jury instructions given[.]" *Id.* The court then considered the circumstances here and determined that

the unanimity language amounted to merely a small portion of the extensive *Allen* charge the trial court gave. In the court's view, several other aspects of the *Allen* charge minimized the unanimity language in these ways:

> [It] cautioned the jurors that the verdict was not to be the . . . mere acquiescence [of the jurors] in order to reach an agreement, that any difference of opinion should cause the jurors to scrutinize the evidence more [carefully and] closely and that the aim was to keep the truth in view as it appeared from the evidence, considered in light of the court's instructions.

*Id.* (citation and internal quotation marks omitted). Plus, the court observed, the trial court polled the jury, and each juror affirmed that the verdicts announced were the verdicts that they had reached. *Id.* Each juror also confirmed that they had rendered their verdicts without any pressure from anyone during their deliberations. *Id.*

In the end, the Supreme Court of Georgia concluded that the *Allen* charge did not unduly coerce the jury into rendering a death sentence because the unanimous-verdict language was required at the time and was "but one small portion of an otherwise balanced and fair *Allen* charge." *Id.* Still, the court recognized that the unanimity language may result in claims of "jury confusion." For this reason, the court instructed future trial courts to exclude this language from *Allen* charges given during the sentencing phase of death-penalty trials. *Id.*

Humphreys argues it was unreasonable for the Supreme Court of Georgia to find that the jury charge, which results in jury confusion, was constitutional. And he claims that when a trial court insists that the jury must reach a decision, even in the face of a deadlock, that instruction is unconstitutionally coercive. We reject both claims. First, the Supreme Court of Georgia did not find that the "unanimous verdict language" in the jury charge *results in* jury confusion; rather, it found that it *could* result in jury confusion. Second, the court made an individualized determination of the circumstances in Humphreys's case to ascertain whether juror confusion occurred in Humphreys's trial and determined it did not.[10]

We must defer to the Supreme Court of Georgia's decision so long as it did not unreasonably determine the facts in light of the evidence presented and its decision was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Humphreys cannot meet the AEDPA standard on either ground.

With respect to its factual determinations, the Supreme Court of Georgia accurately recounted the circumstances leading to the jury's verdict. It correctly noted that, during the sentencing phase, the jury deliberated for approximately eight hours over a

_____

[10] Importantly, the Supreme Court of Georgia found that the inclusion of the unanimity language in an *Allen* charge would require a detailed analysis of the full circumstances of the jury instructions given. Here, the court engaged in that analysis.

period of two days before Foreperson Barber sent the trial court a note that stated,

> We, the jury, have agreed on statutory aggravating circumstances on both counts, but not on the penalty. *Currently* we agreed life imprisonment with parole is not an acceptable option. We are *currently* unable to form a *unanimous* decision on death or on life imprisonment without parole. Please advise.

*Humphreys*, 694 S.E.2d at 331 (emphasis added).

The Supreme Court of Georgia recounted that the trial judge informed counsel of the note and summed up its details, advising counsel that the jury "indicated that they have reached a verdict in regard to some of the issues that have been submitted to them, but have not yet reached a decision on other issues that were submitted to them." *Id.* So the trial court declared its intention to call the jury in and instruct it to continue deliberating. *Id.* When the jurors were brought into the courtroom, the judge instructed them as follows:

> I guess you've been deliberating now about eight hours in the case. And the case was a lengthy trial, and there are a lot of issues. And you need to continue with your deliberations, and address the remaining issues.

The Supreme Court of Georgia next correctly noted that the jury returned to the jury room and continued deliberations for about three more hours before sending a second note to the court. *Id.* at 332. In that note, the jury asked to listen to Humphreys's taped statement to detectives. *Id.* The court allowed the

jury to listen to the statement, and the jury returned to the jury room to continue deliberations. *Id*. After about two hours or so, defense moved for a mistrial. *Id*. The trial court denied the motion, emphasizing that the jury had not indicated that it was deadlocked. *Id*.

Following that motion, the jury deliberated for another roughly two hours, when Foreperson Barber sent a note to the court. She asked to be removed from the jury "[d]ue to the hostile nature of one of the jurors." *Id*. In response to this note, the trial court announced that it intended to give the jury a modified *Allen* charge. *Id*. The Supreme Court of Georgia correctly set forth the verbatim *Allen* charge in its decision, acknowledging that Foreperson Barber's note and the trial court's intent to give an *Allen* charge prompted an objection from the defense and a renewal of the defense's motion for mistrial, which the trial court again denied. *Id*. at 332 & n.7

After reading the juror's note and without identifying from whom it came, the trial court gave the modified *Allen* charge. *Id*. at 332. The jury retired to the jury room at 8:40 p.m., where it deliberated until 10:20 p.m., and then went home for the evening. *Id*. at 333. The following morning, the jurors reconvened and deliberated for two more hours, and the jury returned a death sentence for the two murders. *Id*.

After reviewing the complete record, we cannot say that clear and convincing evidence exists that the Supreme Court of Georgia clearly erred in its factual determinations based on the evidence presented. The sequence of events and other facts set

forth by the court were correct. Humphreys does not appear to dispute this. Rather, he argues that the court's legal conclusion of no coercion was unreasonable.

But on this record, we cannot say that the Supreme Court of Georgia's decision was contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States. With respect to the trial court's first decision to send the jurors back for further deliberations, the court correctly observed that whether a jury is "hopelessly deadlocked" is a determination to be made by the trial court and will be reversed on appeal only for an abuse of discretion. *Humphreys*, 694 S.E.2d at 332. And here, the court emphasized, the trial was lengthy, the jury "had been deliberating for less than nine hours, and the language twice used in the note that the jurors 'currently' were not able to agree indicated that deliberations were ongoing." *Id.*

As for the two later notes, the Supreme Court of Georgia again pointed to the length of the trial in relation to the time the jury had been deliberating, and the court also noted that the jurors had recently requested to rehear evidence. *Id.* at 333. These facts, the court said, showed that the jurors were continuing to actively deliberate. *Id.* We can't say that the Supreme Court of Georgia's determinations in these regards were unreasonable.

With respect to the *Allen* charge, the Supreme Court of Georgia recognized the correct law in its analysis, considering whether, as a whole, the charge was "so coercive as to cause a juror

to abandon an honest conviction for reasons other than those based upon the trial or the arguments of other jurors." *Id.* (citation and internal quotation marks omitted). It concluded that it was not. Then, the court emphasized that the trial court polled the jurors, and each juror disavowed any coercion. *Id.* at 334. Again, these determinations are neither unreasonable nor contrary to law.

The Supreme Court's case law on what constitutes a coerced verdict is quite limited. When the Supreme Court of Georgia issued its decision here, the leading case on this topic was *Lowenfield*. There, the Supreme Court determined that a jury's penalty-phase verdict was not coerced after the trial court polled the jurors on whether further deliberations would be helpful and then instructed the jury to continue deliberating. 484 U.S. at 240–41.

In *Lowenfield,* the Supreme Court acknowledged that juror coercion can support a constitutional claim and that the relevant inquiry is the totality of the circumstances. *Id.* at 237–38. That said, the Supreme Court hasn't shed further light on what constitutes juror coercion that violates a defendant's constitutional rights. Given this fact and the Supreme Court of Georgia's analysis here, we cannot conclude that the Supreme Court of Georgia unreasonably applied existing federal law.

To the extent that Humphreys relies on *Jenkins* to support his argument that his conviction should be reversed, we disagree. In *Jenkins*, the Supreme Court reversed a conviction based on jury instructions given in a federal prosecution. But the Court has since explained that it based its decision there on the Court's

"supervisory power over the federal courts, and not on constitutional grounds." *Lowenfield*, 484 U.S. at 239 n.2 (citation omitted); *Early v. Packer*, 537 U.S. 3, 10 (2002) (per curiam). The same is true of the Court's decision in *United States v. Gypsum Co.*, 438 U.S. 422 (1978), another case upon which Humphreys relies. Consequently, both *Jenkins* and *Gypsum Co.* "are off the table as far as § 2254(d) is concerned." *Sears*, 73 F.4th at 1304 (quoting *Packer*, 537 U.S at 10).

In sum, the Supreme Court of Georgia accurately portrayed the facts and examined the *Allen* charge in its entirety, determining that the trial court did not coerce the jury to return a death sentence. Under AEDPA, we must defer to the Supreme Court of Georgia's decision because it did not unreasonably determine the facts in light of the evidence presented, and its finding of no coercion was not contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court.

## D.    *Ineffective Assistance of Trial Counsel*

In his final claim, Humphreys challenges the state habeas court's finding that his trial counsel was not ineffective in investigating and presenting mitigation evidence. In Humphreys's view, trial counsel's failure to conduct a thorough and accurate mitigation case caused them not to learn about years of childhood sexual abuse that Humphreys endured from his great-grandmother, the full extent of his mother's neglect and abuse, or his lengthy family history of mental illness, abuse, and drug dependency. Humphreys also complains that the defense did not accept the diagnoses of their own mental-health clinician because someone on the defense

team had already "chosen" another diagnosis for Humphreys—Asperger's Syndrome. Based on these claims, Humphreys contends trial counsel's representation of him fell below the prevailing professional norms. Had a jury had heard the undiscovered, unpresented evidence, Humphreys contends, "there is clearly a reasonable probability that the . . . jury . . . 'would have struck a different balance.'"

As we've noted, the state habeas court denied Humphreys's claims after holding an evidentiary hearing during which new counsel presented evidence in support of Humphreys's claims. The Supreme Court of Georgia denied a certificate of probable cause to appeal, and the district court denied relief on the claim. We apply AEDPA deference to the state habeas court's opinion. That requires us to deny Humphreys's petition on this ground.

First, the state habeas court discussed at length the qualifications of the defense team and, based on these details, it determined that Humphreys's trial counsel were death-penalty qualified and their experience supported a finding of effective assistance of counsel.

Next, the state habeas court described the investigation the defense team conducted and found it to be reasonable. The court noted that counsel interviewed Humphreys's family members, friends, co-workers, and teacher, where available. The defense team also spoke with Humphreys, his father, stepmother, brother-in-law, paternal grandmother, aunt, uncle, and stepfather about Humphreys's mental-health history and questioned them about

any physical, mental, or sexual abuse Humphreys suffered. During this investigation, neither Humphreys nor any of his family members indicated that he had been sexually abused.

Besides these steps, defense counsel reviewed Humphreys's prison records, criminal records, employment records, family records, financial records, legal records, medical records, social-services records, psychological records, and school records. And to prepare for the sentencing phase, defense counsel hired a licensed clinical social worker (Marti Loring, who met with Humphreys and diagnosed him with post-traumatic stress disorder ("PTSD") and Asperger's Syndrome), a prison adaptability expert (James Aiken), a neuropsychologist (Robert Schaffer, who diagnosed Humphreys with PTSD, Dissociative Disorder, and Asperger's Syndrome), a psychiatrist (Bhushan Agharkar, to render an opinion as to trauma and abuse),[11] a victim outreach specialist, and a trauma expert.

As for the investigation of childhood sexual abuse, at the evidentiary hearing, mitigation specialist Laura Switzer testified that she suspected Humphreys had been sexually abused. But during the defense team's interviews of witnesses (including Humphreys), no one reported that he had been sexually abused. In fact, the defense team asked Humphreys directly about sexual abuse, but Humphreys denied any recollection of such abuse.

---

[11] Dr. Agharkar disagreed with the diagnosis of Asperger's Syndrome, and defense counsel decided he would not testify since his evaluation did not support their sentencing-phase theory.

The state habeas court summarized defense counsel's presentation during the guilt-innocence phase as follows: (1) Humphreys's childhood was characterized by violence, trauma, and instability and that he was raised by a dysfunctional, abusive family; (2) Humphreys's parents divorced when he was two years old, and he lived with his mother for a while, during which he received a head injury that resulted in a concussion; (3) when Humphreys's father gained custody of him, violence and disruption occurred in the home; and (4) Humphreys was placed in special education because of behavioral problems. The state habeas court also noted that trial counsel advised the jury about Humphreys's mental-health issues, including about dissociative episodes that started when he was a teenager, and about his obsessive-compulsive behavior ("OCD"). Finally, the state habeas court acknowledged that trial counsel presented evidence that Humphreys was non-violent and non-confrontational.

As for the state habeas court's findings about counsel's performance during the penalty phase of the trial, it determined that trial counsel "made a reasonable presentation during the sentencing phase based on their strategy and the information discovered during their investigation." It recognized the strategy was to present evidence of Asperger's Syndrome as well as Humphreys's traumatic childhood to allow the jurors to have some empathy for him. The state habeas court pointed out that defense counsel used the testimony of six lay witnesses and three experts to present the information to the jury.

The state habeas court summarized the testimony of each witness.  As relevant here, the court pointed out that trial counsel presented the testimony of Humphreys's stepmother, Janie Swick, who conveyed the dynamics in the home, including that Humphreys's father was verbally and physically abusive to him.  Swick explained that Humphreys's father "bullied" him and caused him to run away in fear.  She recalled an incident in which Humphreys's father struck him in the arm with a broom, requiring Humphreys to go to the hospital.  Swick also informed the jury that Humphreys did not have many friends growing up and had mental problems, and she said she regretted not getting psychological help for Humphreys.

Next, Humphreys's half-sister Julia testified to the abuse their father inflicted on them.  Although the father disciplined all the children, Julia characterized the abuse he inflicted upon Humphreys as "very bad."  Julia explained that her father used switches and belts to discipline the children.  And she recalled an incident where their father challenged Humphreys to a fight.  During that fight, their father repeatedly punched Humphreys in the head before he finally escaped.

Later, the state habeas court turned to the testimony of Humphreys's sister Dayna, who gave examples of their "rather difficult" early childhood.  According to Dayna, their father was an unhappy man who was hard on them and showed very little affection.  He did not handle stress well and often became angry and violent.  Dayna testified that their father physically abused her and

Humphreys throughout their childhood, imposing whippings with a large belt or stick. Their father beat Humphreys with his fist.

The state habeas court further recounted the testimony of the two expert witnesses trial counsel presented to the jury during the mitigation phase. Dr. Loring, who was qualified as an expert in social work and trauma, testified that she met with Humphreys on four occasions for approximately three hours each time. Dr. Loring also interviewed sixteen individuals to get their perceptions, experiences, and observations of Humphreys. To complete her analysis of Humphreys, Dr. Loring reviewed extensive records including police records, school records, jail records, divorce records, work records, and hospital records.

Dr. Loring testified to the jury that Humphreys's childhood was marked by abuse; he spent his early childhood living in a home where drugs were bought and sold. As evidence of the "extensive physical abuse," Dr. Loring testified that the Department of Family and Children Services discovered cigarette burns on Humphreys when he was a child. At age two, Humphreys's entire body was bruised following a beating by his father, who admitted that he had "lost it" and beaten him. At age three, he was taken to the hospital for a fractured skull. At age four, his shoulder was dislocated as the result of a violent shaking by his father. Dr. Loring also spoke of the incident where Humphreys's father hit Humphreys with a broom handle. After the incident, his father threatened to kill his stepmother if she tried to take Humphreys to the hospital for treatment. Besides these incidents, Dr. Loring recounted that

Humphreys's father had severely beaten by him because he got into a car accident and, on another occasion, his father sat on his private parts, holding Humphreys's hands above his head and continually beating him in the head and the chest.

And the state habeas court noted that Dr. Loring explained to the jury that Humphreys's father flew "into a rage as a matter of pattern, not just one time or two, and he would whip or beat [Humphreys]." Dr. Loring described the abuse as "not only explosive physically, where [Humphreys] would get slapped and punched, thrown across the room, indeed, but there was a very remarkable emotional component to the abuse that [his father] committed upon [Humphreys and his sister]." In Dr. Loring's view, this was "ritualistic emotional abuse," meaning a series of steps led up to the physical abuse.

The state habeas court also considered Dr. Loring's testimony that, growing up, Humphreys was in special education and exhibited "odd classroom behavior, inappropriate behavior, that was marked by a lack of focus, being hyper, [and] a lack of concentration." She said these symptoms were often seen in children who are traumatized and abused. Dr. Loring also told the jury that as a result of his abusive upbringing, Humphreys tended to wander off, even to different states, evidencing Humphreys's dissociation.

Dr. Loring advised the jury that she had diagnosed Humphreys with PTSD and Asperger's Syndrome. In Dr. Loring's view, Humphreys suffered from PTSD because of the trauma he

experienced during his childhood and teenage years.  Regarding her diagnosis of Asperger's Syndrome, Dr. Loring educated the jury that individuals with Asperger's Syndrome were "very impaired in their ability to be close or intimate with another person" and severely suffered from a "sustained impairment in social interaction."  Dr. Loring provided several indicia to support her diagnosis of Humphreys.  She opined that he had "a real impaired ability to relate to people and to empathize with them," and his life experiences caused him to be "much more involved with objects or cleaning or a kind of ritual of what you do at what moment in time."

When the state habeas court finished reviewing Dr. Loring's testimony to the jury, it then went through Dr. Robert Shaffer's testimony.  Dr. Schaffer, a clinical psychologist, interviewed six individuals about their observations of Humphreys.  Dr. Shaffer also spoke with Dr. Loring about the social history she prepared on Humphreys and reviewed police reports, hospital records, school records, and prison records.  Based upon his evaluation, Dr. Shaffer opined that Humphreys suffered from PTSD, Dissociative Disorder, and Asperger's Syndrome.

In support of his diagnosis of Asperger's Syndrome, Dr. Shaffer testified that Humphreys had very unusual cleaning routines, and he explained that Humphreys became uncomfortable and agitated if his routine was disturbed.  Dr. Shaffer also testified that Humphreys met the criteria for Asperger's in that he had an "extreme interest" in reading science fiction and constantly talked

about these books for hours with different people as if they really could be true.  Additionally, Dr. Shaffer recounted Humphrey's lack of the normal emotional give and take.

As for Dissociative Disorder, Dr. Shaffer said that involved an individual who "split[s] off from their normal state of aware-ness" and experiences "periods of productive and active behaviors, and then later, ha[s] no recollection of that."  Dr. Shaffer opined to the jury that Humphreys suffered from Dissociative Disorder as a result of the violence in his home, so Humphreys was unaware of the "normal judgment and thoughts and memories that he has to bring to bear on a situation."

Besides this testimony, Dr. Shaffer told the jury that Hum-phreys met all the diagnostic criteria for PTSD.  In Dr. Shaffer's view, there was "pretty strong evidence that there was significant abuse before [Humphreys's] age of earliest memory."  And he also said that the second category of diagnostics for PTSD—avoidance of the memories—also applied to Humphreys, as there was "clear evidence of a great deal of denial" by Humphreys.  Finally, Dr. Shaffer testified that Humphreys's denial was his attempt to "avoid re-experiencing the problems and horrors" that occurred in his life.

The state habeas court then recounted the evidence pre-sented during the habeas proceedings:  (1) the testimony of Hum-phreys's step-siblings, who testified that Humphreys's mother ver-bally and physically abused them, (2) Humphreys's ROTC teacher, who testified that he was in special education classes for a

behavioral disorder, (3) Humphreys's childhood neighbor, who testified that Humphreys's father yelled at him often and spanked him in the yard after he soiled his underwear, and (4) two expert witnesses.

The most relevant testimony here was that of the two expert witnesses, Dr. Julie Rand Dorney and Dr. Victoria Reynolds. The state habeas court recounted that testimony.

It noted that Dr. Dorney, an expert in forensic psychiatry, testified she performed an examination of Humphreys over the course of two days, and diagnosed him with obsessive-compulsive disorder and depressive disorder, NOS. She also found that he had many symptoms of both PTSD and bipolar disorder, but she concluded he did not meet all the criteria for either diagnosis. Dr. Dorney testified that, in her second meeting with Humphreys, he told her that he had been sexually abused by his great-grandmother.

As for Dr. Reynolds, an expert in trauma and its impact on victims, she testified about much of the evidence presented in the sentencing proceedings. She acknowledged that when she spoke to Humphreys about his great-grandmother, he did not reveal the sexual abuse. Still, Dr. Reynolds suspected Humphreys had been sexually abused based on his level of dissociativeness, his level of compartmentalization, and his sexual activity. Dr. Reynolds also spoke about the trauma Humphreys endured growing up, including a skull fracture, the instability in the home, and physical abuse.

After these detailed inventories of defense counsel's presentation of evidence at the mitigation stage and habeas counsel's presentation of evidence at the habeas hearing, the state habeas court concluded that trial counsel performed adequately. And "particularly in light of trial counsel's thorough investigation and strategic decisions[,]" the state habeas court determined that Humphreys was not prejudiced by counsel's failure to discover and present the additional mitigation evidence Humphreys said should have been presented. As the state habeas court emphasized, trial counsel was not required to present all mitigation evidence and "[c]onsidering the realities of the courtroom, more is not always better. . . . [G]ood advocacy requires 'winnowing out' some arguments, witnesses, evidence, and so on, to stress others."

Plus, the state habeas court observed that the evidence submitted during the habeas proceedings was largely cumulative of the evidence presented at trial. Indeed, the court concluded, the only truly "new evidence" concerned Humphreys's past sexual abuse, although neither Humphreys nor anyone else had disclosed the abuse prior to the habeas proceedings. Still, the state habeas court noted, Humphreys's defense team remained suspicious and investigated further. The court explained that it "weigh[ed] heavily the information provided by the defendant" in evaluating the reasonableness of counsel's investigation.

Here, Humphreys did not provide the court with any evidence of sexual abuse that would have been available to trial counsel. The only evidence was his self-report to Dr. Dorney, *after* the

sentencing proceedings. Given these circumstances, the state ha-
beas court explained that trial counsel "does not render ineffective
assistance by failing to discover and develop evidence of childhood
abuse that his client does not mention to him." Accordingly, the
state habeas court concluded trial counsel's performance was not
deficient "for not presenting evidence that [Humphreys] withheld
from them."

And in any case, the state habeas court determined that
Humphreys failed to show any prejudice since the additional evi-
dence presented in the habeas proceedings would not have created
a reasonable probability of a different outcome. As the court ex-
plained, a comparison of the trial record with the habeas record
"shows the majority of the evidence presented in habeas reiterated
the testimony presented at trial."

As for the expert testimony, the state habeas court recog-
nized that the habeas experts diagnosed Humphreys with OCD,
but the trial experts diagnosed him with PTSD, dissociative disor-
der, and Asperger's Syndrome. But the court reasoned that the di-
agnoses were based on the same behaviors and symptoms. And
while OCD could be one possible diagnosis, it was not the only rea-
sonable diagnosis that could be made from the information.

With respect to the new evidence of past sexual abuse, even
assuming the investigation was deficient (as we've noted, the court
found it wasn't because the defense team expressly asked about sex-
ual abuse and Humphreys and his relatives and friends did not dis-
close it), Humphreys still did not demonstrate a reasonable

probability that the outcome would have been different if the evidence had been presented at trial, given the weight of the mitigation evidence that counsel did present.

In sum, the state habeas court found that Humphreys failed to show deficient performance *or* the required resulting prejudice. Consequently, the state habeas court denied the ineffective-assistance-of-trial-counsel claims.

As we have already noted, to succeed on an ineffective-assistance-of-counsel claim, the petitioner must show both that (1) his attorney's performance was deficient, and (2) the deficiency prejudiced his defense. *Strickland*, 466 U.S. at 687. And because *Strickland*'s standard itself requires deference to counsel's performance, and AEDPA, by its terms, requires deference to state-court decisions, our review of state courts' resolution of the deficient-performance prong of *Strickland*'s ineffective-assistance standard requires double deference. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011).

After careful consideration, and applying AEDPA deference, we conclude that the state habeas court reasonably determined that Humphreys failed to show unconstitutionally deficient performance on the part of his trial counsel. In answering this question, we reweigh the aggravating evidence against the totality of the available mitigating evidence. *See Ferrell v. Hall*, 640 F.3d 1199, 1234 (11th Cir. 2011). In doing so, we find nothing unreasonable about the state court's determination that counsel were not deficient in not uncovering Humphreys's sexual abuse. Here, members of the defense team interviewed Humphreys and others, asking

specifically whether Humphreys had been sexually abused. No one responded that he had. Counsel also reviewed medical, school, and other records, but they, too, failed to reveal Humphreys's sexual abuse. A defense attorney preparing for sentencing in a capital trial is not required "to scour the globe on the off chance something will turn up." *Everett v. Sec'y, Fla. Dep't of Corr.*, 779 F.3d 1212, 1250 (11th Cir. 2015) (quoting *Rompilla*, 545 U.S. at 382–383).

As for the additional evidence of Humphreys's non-sexual abuse and his mental conditions, counsel presented substantial mitigation evidence, and the new habeas evidence was mostly cumulative of what was presented during the trial and sentencing proceedings. The jury learned of the severe and frequent physical and mental abuse, as well as neglect, that Humphreys suffered as a child. It also learned of Humphreys's mental-health issues—his dissociative episodes, his OCD behaviors, and his other odd behavior.

The state habeas court reasonably concluded that any additional evidence about these issues would be cumulative. The "mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *Chandler v. United States*, 218 F.3d 1305, 1316 n.20 (11th Cir. 2000) (citation omitted).

Finally, as for Humphreys's suggestion that his trial counsel conducted a last-minute mental-health investigation and reached an unreasonable conclusion that he suffered from Asperger's Syndrome, we cannot conclude that the state habeas court

unreasonably rejected that claim, either. Dr. Shaffer conducted his first evaluation of Humphreys in May 2005, but at that time, he was instructed not to prepare a written report. Dr. Shaffer later conducted a second evaluation of Humphreys in August of 2007 after reviewing additional records, reviewing case information, and interviewing witnesses. After the second evaluation, Dr. Shaffer diagnosed Humphreys with PTSD, Dissociative Disorder, and Asperger's Syndrome. This timeline refutes the idea that defense counsel waited until just prior to trial to develop a mitigation strategy and hire defense experts.

Humphreys focuses on the opinion of another doctor who agreed with Dr. Shaffer's findings that Humphreys exhibited symptoms of PTSD but disagreed with the Asperger's Syndrome diagnosis. The defense was not required to present the testimony of the second doctor; it made a strategic decision not to present it. And the state habeas court was not unreasonable in concluding that decision was within competent counsel's discretion. *See Nance v. Warden, Ga. Diagnostic Prison*, 922 F.3d 1298, 1302 (11th Cir. 2019) ("It is especially difficult to succeed with an ineffective assistance claim questioning the strategic decisions of trial counsel who were informed of the available evidence."). After all, other evidence supports defense counsel's strategy. Along with Dr. Shaffer, Dr. Loring opined that Humphreys suffered from PTSD and Asperger's Syndrome. Consequently, two doctors' findings supported the defense team's decision. And both Dr. Loring and Dr. Shaffer testified as to how they came up with their diagnoses.

For these reasons, the state habeas court's determination that defense counsel was not ineffective is entitled to deference. We will not disturb that finding on the grounds advanced by Humphreys.

Though this conclusion requires us to deny Humphreys's petition even without considering the state habeas court's prejudice determination, we nonetheless find that the court's prejudice determination was likewise not unreasonable. As the state habeas court explained, with the exception of the sexual-assault evidence, the remainder of the evidence was largely cumulative of the hefty mitigation evidence trial counsel presented to the jury. And we cannot say the habeas court unreasonably concluded that the addition of the sexual-assault evidence would have made an overall difference in the impact of the mitigation case, given the strong evidence of abuse and mental-health issues counsel presented. So for this reason, too, we reject Humphreys's claim of ineffective assistance.

## IV.    CONCLUSION

Our review of the record compels the conclusion that Humphreys is not entitled to relief on any of the claims he presented in his petition for writ of habeas corpus. We therefore affirm the district court's denial of Humphreys's habeas petition.

**AFFIRMED.**

ROSENBAUM, Circuit Judge, Concurring:

I concur in the panel opinion because I think that a combination of the no-impeachment rule and the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") require it. But I am deeply concerned about what transpired during jury deliberations here.

Linda Chancey swore under oath during voir dire that her attacker "actually didn't do [her] any physical bodily harm" because she "escape[d] before he actually physically entered the dwelling." That was false. Chancey told jurors that she "was naked in her bed and a man broke in and attacked her" in her bed. And after trial, Chancey told Humphreys's investigators that "a strange man came through the window of her apartment, robbed her, and tried to rape her." These were important facts, and had Humphreys's lawyers known of them, they could have exercised the remaining peremptory strike to remove Chancey from the jury. But they didn't know about them. And they didn't know because Chancey lied during voir dire.

Even worse, Susan Barber testified that on "day one, [Chancey] had her mind made up: early in the trial—before the end of the first phase—she said something along the lines of he's guilty and he deserves to die." Indeed, according to Barber, Chancey told the other jurors that she "would only vote for death."

So even when the other eleven jurors, after deliberating many hours, voted for life without parole, Chancey would not even consider it. Of course, it was Chancey's right to vote for death if

she thought the facts warranted it. But Humphreys had the right to expect that (a) Chancey had told the truth during voir dire, and (b) she would at least honestly consider imposing a sentence of life without parole.

Worse still, Chancey incorrectly told the other jurors that "they had to reach a unanimous decision or [Humphreys] would be paroled." That, of course, was wrong. In fact, had the jurors failed to reach a unanimous decision, Humphreys would have been sentenced to life without parole under Georgia law. But Chancey's incorrect statement, combined with the court's repeated instructions to the jury to continue deliberating, caused Barber to believe incorrectly that if the jury didn't return a death verdict, Humphreys would be sentenced to life imprisonment with the possibility of parole or that he could "walk."

Based on Barber's testimony about what occurred during jury deliberations, two things seem clear: (1) Chancey was dishonest during voir dire, and her undisclosed bias likely made her unable to consider any verdict other than death, and (2) had the jury not incorrectly believed, as a result of the trial court's instructions and Chancey's statements, that Humphreys would have been released or been sentenced to life with the possibility of parole if the jury couldn't return a verdict, the jury wouldn't have returned a verdict, and Humphreys would have been sentenced to life imprisonment without the possibility of parole. Put simply, I do not doubt that the errors here "actually prejudice[d]" Humphreys. *See Brecht v Abrahamson*, 507 U.S. 619, 637 (1993). When an error "actually

prejudices" a defendant and that error is the difference between life and death, in my view, we should be able to correct that error.

But we can't here. The problem is that proving prejudice requires us to consider the jurors' testimony about what occurred during deliberations. Yet Georgia law and the no-impeachment rule prohibit us from doing just that.

True, the Supreme Court has identified an exception to the no-impeachment rule. But the Court has never recognized an exception under the specific circumstances here (and when the state courts considered Humphreys's case, the Supreme Court had yet to apply the limited exception in any case).

And while the Court has limited any exception to the "gravest and most important of cases"—a category into which death-penalty cases would seem to fall—AEDPA's standard of review cuts off that avenue for granting the petition. As I've noted, the Supreme Court has applied the exception in only a single case ever—and the reason there was the juror's racial bias, which was not the case here. And though a Supreme Court case need not be directly on point to make it applicable, here, the Supreme Court has otherwise consistently refused to apply the exception and has cautioned time and again against construing the exception in any way but extremely narrowly.

Given this precedent, if we faithfully apply AEDPA's standard of review, we cannot find that the state court's decision was "contrary to" federal law. 28 U.S.C. § 2254(d)(1). That's so because the state court's decision does not "contradict[] the United States

Supreme Court on a settled question of law or hold[] differently than did that Court on a set of materially indistinguishable facts." *Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1325 (11th Cir. 2013) (citation omitted).

So I must reluctantly concur in today's opinion. But I don't think that makes it right.